**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TERRIE SULLIVAN and VERONICA RODRIGUEZ, individually and on behalf of others similarly situated,<br><br> Plaintiffs,<br><br> v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br><br> Defendant. | Civil Action Case No.<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Terrie Sullivan and Veronica Rodriguez ("Terrie and Veronica" or "Plaintiffs"), individually and on behalf of all others similarly situated, for their Complaint against Liberty Mutual Insurance Company ("Liberty" or "Defendant"), state and allege as follows.

### INTRODUCTION

1.     Plaintiff Terrie Sullivan is a Black, queer woman.  Plaintiff Veronica Rodriguez is a Latino American, queer woman.  Terrie and Veronica have been married since 2014.

2.     In August 2020, Terrie and Veronica purchased a townhome in Evanston, Illinois (their "Home") and added property coverage to their existing Liberty Mutual insurance policy (the "Policy").

3.     The Policy provides dwelling, structure, and personal property coverage for Terrie and Veronica's home for the period August 20, 2020 through August 20, 2021.

4.      In September, October and November 2020, Terrie and Veronica's toilet overflowed multiple times, resulting in significant damage to their home caused by contamination with Category 3 black water.

5.      Terrie and Veronica made a timely claim for coverage under their Policy.

6.      During the claim adjustment process, Liberty engaged in multiple instances of discriminatory conduct toward Terrie and Veronica based on their race and sexual orientation and, ultimately, denied most of Terrie and Veronica's claim.  Specifically:

- Giving less credence to claims made by minorities, Liberty failed to take Terrie and Veronica's claim seriously, initially denying it (without even speaking to them) on the basis that the damage was caused by a basement sump pump failure. Terrie and Veronica's home has neither a sump pump nor a basement.

- The Liberty claims handler later assigned to adjust Terrie and Veronica's claim referred to Terrie as a "nigger-carpet muncher."

- Skeptical of minorities owning expensive items, another adjuster viewed Terrie and Veronica's claim with unjustified suspicion and questioned whether they could afford to own costly articles.

- Because of their status as minorities, Liberty held Terrie and Veronica to a higher standard than non-minority policyholders and required them to go to extra lengths to justify and prove their claim to Liberty.  This caused the claim adjustment process to take significantly longer and caused Terrie and Veronica needless aggravation and emotional distress.

7.      After learning about the derogatory comments made about them, Terrie and Veronica wrote a letter to Liberty complaining about the way they were being treated.  In response, Liberty conducted a sham investigation, hiring a longtime outside counsel for Liberty—rather than an independent investigator—who focused his perfunctory inquiry on discrediting the complainants rather than addressing Liberty's discriminatory conduct and the company culture that permitted such behavior to permeate the company's business.

8.      Terrie and Veronica bring this action on their own behalf and on behalf of all similarly situated policyholders for (1) discrimination in violation of Title VIII of the Civil Rights Act of 1986 (the "Fair Housing Act"), (2) discrimination in violation of 42 U.S.C. §§ 1981 and 1982, (3) discrimination in violation of 775 ILCS 5/3-101, *et seq.* (the "Illinois Human Rights Act"), (4) breach of contract, and (5) bad faith claims handling practices.

## PARTIES

9.      Plaintiffs Terrie Sullivan and Veronica Rodriguez are residents of Cook County, Illinois.

10.     Defendant Liberty Mutual Insurance Company is a corporation organized and existing under the laws of the State of Massachusetts with its principal place of business located in Boston, Massachusetts.  Liberty Mutual sells homeowners' insurance policies and otherwise operates and does business in the State of Illinois.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs allege claims that arise under the laws of the United States.  Plaintiffs' state law claims are part of the same case or controversy and thus fall within the Court's supplemental jurisdiction.  28 U.S.C. § 1367.

12.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## DISCRIMINATION IN THE INSURANCE INDUSTRY

14.     Black homeowners have experienced, and continue to experience, discriminatory insurance claims handling practices.[1]

15.     Claims handlers (*e.g.*, adjusters and investigators) subject Black, Latino, and LGTBQ ("Minority") policyholders' claims to scrutiny that they do not apply to white policyholders.[2]

16.     Insurance companies improperly question the value of property owned by minority policyholders, intimidate minority policyholders by insisting that they meet requirements not required of white policyholders, and treat minority policyholders' claims with undue suspicion.[3]

17.     Minority policyholders are thus forced to expend more time than white policyholders substantiating their claims, must wait longer to receive claims payments and have their claims denied more often.[4]

18.     Claims handlers employed by insurance companies are overwhelmingly white.[5] The lack of diversity amongst claims handlers creates an environment ripe for conscious and subconscious bias against minorities.

---

[1] Emily Flitter, *Black Homeowners Struggle to Get Insurers to Pay Claims*, New York Times, Dec. 29, 2020 (updated Jan. 1, 2021), https://www.nytimes.com/2020/12/29/business/black-homeowners-insurance-claim.html.

[2] *Id.* ("'Anytime there's a lot of discretion, there's room for that discretion to be affected by implicit or explicit bias,' said Tom Baker, a University of Pennsylvania Law School professor who studied insurance payouts to victims of Hurricane Andrew in 1992. Using data obtained from the victims, he found that Latino claimants faced significantly longer delays in receiving money from insurers than white claimants did.")

[3] *Id.*

[4] *See id.*

[5] *See, e.g.,* Terrance J. Evans, *An Analysis of Diversity and Inclusion in the Insurance Industry*, THE AMERICAN BAR ASSOCIATION (December 9, 2019) (showing that 82% of insurance professionals at mutual insurance companies are Caucasian, and only 4% and 7% are African American or Latin American, respectively).

19.     However, this form of discrimination is lucrative for insurers because it results in payment of fewer claims and thus greater profits.  Accordingly, to perpetuate the *status quo*, in September 2020 the Federal Advisory Committee on Insurance, whose membership includes numerous insurance industry executives, refused to investigate racial bias in the industry.[6]

### TERRIE AND VERONICA'S INSURANCE CLAIM

20.     Shortly after purchasing their home in August 2020, Terrie and Veronica experienced multiple occurrences of Category 3 contaminated water backup.[7]

21.     On September 28, 2020, the toilet in Terrie and Veronica's bathroom overflowed, causing contaminated water to spill into their bathroom.

22.     One week later, the same toilet backed up again, causing Category 3 contaminated water to once again spill from the toilet into the bathroom.

23.     On October 21, 2020, the toilet overflowed yet again, this time flooding the bathroom, the entryway, the living room, the laundry closet, and the kitchen.

24.     Finally, on November 10, 2020, the toilet backed up for a fourth time, causing contaminated water to once again spill into the bathroom, entryway, and kitchen area.

25.     After each of the first three occurrences, Terrie and Veronica called a plumbing company, Splash Plumber ("Splash") to inspect and remedy the issue.  Each time, Splash determined that tree roots clogged the drain and caused the backup.

---

[6] Flitter, *Black Homeowners Struggle to Get Insurers to Pay Claims*, Dec. 2020 ("In late September, the Federal Advisory Committee on Insurance, whose members include top executives from the nation's biggest insurers, voted down a proposal to study racial bias in the industry over concerns that the study would muddy the distinction between the legitimate discretion insurers have to question claimants' assertions and unfair bias.")

[7] Category 3 water damage, aka "Black Water" damage, is the most extreme kind of water damage and requires swift action to mitigate serious health risks.  Black water includes sewage, rising flood waters, and seawater, as well as river and ground water.  When Category 3 water damage occurs, many items and materials will need to be removed and the home will need to undergo significant disinfecting. https://www.fprestoration.com/blog/2019/august/understanding-the-3-types-of-water-damage/

26.     The flooding caused substantial damage to Terrie and Veronica's floors, furniture, and other personal property.  Items such as towels, blankets, clothes, and camping equipment were soaked in contaminated water and had to be disposed.

27.     On November 11, 2020, Terrie and Veronica contacted Chris Alexa ("Alexa") of Clark Interior Exterior, a General Contractor, to examine the extent of damage to the property and perform water remediation services.

28.     Alexa evaluated the damage and concluded that the hardwood floorboards in the bathroom, entryway, kitchen, and living room were warped, that the drywall around the bathroom, entryway, and living room was contaminated, that the front door was damaged, and that mold had grown in multiple floor vents into which contaminated water had spilled.  Alexa indicated that the entire downstairs wood floor needed to be replaced.  Moreover, because the contaminated water reached the kitchen cabinets, Alexa assessed that the cabinets needed to be replaced, potentially together with the kitchen countertop that would likely crack when the cabinets were removed.  (Exhibit 1 – Declaration of Chris Alexa).

29.     Due to high levels of moisture in their home caused by the backups, Terrie and Veronica fell sick.  By November 2020, Veronica had developed a serious sinus infection for the first time in her life.  At around the same time, Terrie, who had a history of bronchitis, began experiencing asthma flare ups.

30.     In an attempt to remove as much of the contamination as possible, Terrie and Veronica disposed of furniture and personal property that had come into contact with the contaminated water.

31.     On November 16, 2020, Terrie and Veronica filed an insurance claim, which Liberty assigned to its adjuster, Colby Sherbafi ("Sherbafi").

## LIBERTY DENIES THE CLAIM BUT THEN REVERSES ITS DECISION

32.     On November 24, 2020, eight days after Terrie and Veronica made their claim, Sherbafi telephoned Veronica and informed her that the claim would be denied because the damage was caused by a basement sump pump failure.

33.     Liberty's position was baseless.  To begin with, Sherbafi had decided to deny the claim without inspecting the property or even speaking with Terrie and Veronica.  If he had done so, he would have learned, as Terrie and Veronica subsequently informed him, that their home had neither a sump pump nor a basement.

34.     Terrie and Veronica tried to reason with Sherbafi.  They continued speaking with him and submitted multiple documents he requested, including a timeline of events and invoices from Splash Plumbing.

35.     Similarly, Terrie and Veronica's contractor, Chris Alexa, spoke with Sherbafi on several occasions in an attempt to persuade Liberty to reverse its wrongful denial.

36.     Recognizing his mistake, in January 2021, Sherbafi informed Terrie during a telephone call that the claim would, in fact, be covered after he confirmed a few details with Splash.

37.     But then Sherbafi stopped working on the claim.  On February 4, 2021, Terrie emailed and texted Sherbafi to check on the status of the claim.  Sherbafi responded that he still had not received the requested reports from Splash.  On March 3, 2021, Terrie again emailed Sherbafi to inquire about the status of the claim.  In response, Terrie received an automatic reply stating that Sherbafi was out of the office.  On March 19, 2021, Terrie again emailed Sherbafi, requesting a phone call to discuss the next steps.  This time, Terrie received an automatic reply indicating that Sherbafi was no longer employed with Liberty.

38.     After receiving the auto reply, Terrie and Veronica contacted Liberty claims supervisor, Michael Holmes ("Holmes").

<u>LIBERTY ASSIGNS A NEW ADJUSTER AND REVERSES COURSE YET AGAIN</u>

39.     On March 23, 2021, Holmes advised Terrie and Veronica that their new adjuster would be James Orchard ("Orchard").

40.     When Orchard took over the claim, Liberty reversed course yet again.  After having first denied the claim on a plainly false basis, only to subsequently indicate that the claim would be covered, Holmes and Orchard now insisted—for the very first time—that no coverage determination would be made until Liberty conducted a physical inspection.  Liberty demanded the inspection despite the fact that it, at this point, had received sufficient documentation of the extent of Plaintiffs' damages from Splash to allow an adjuster to determine that Plaintiffs' claim should be covered under the Policy.

41.     Liberty's belated and unreasonable request for an inspection was indicative of the discriminatory claims handling practices to which Liberty subjects its minority policyholders.

42.     Terrie and Veronica expressed their reservations with having another stranger enter their home in the midst of the pandemic under circumstances plainly indicative of bad faith claims practices.  But despite Sherbafi's latest indication that the claim would be covered, Holmes and Orchard continued to insist on a physical inspection, refusing to provide any alternatives despite Liberty's own website noting the option of a live video call in lieu of in-person inspections.

43.     On April 10, 2021, Liberty updated its claim portal to indicate that Plaintiffs' claim was denied and uploaded a denial letter listing "sump pump backup" as the basis for denial

– despite the fact that Terrie and Veronica had informed Liberty about five months earlier that their home did not have a sump pump.

44. Exasperated with Liberty's conduct and shifting coverage position, on April 10, 2021, Terrie and Veronica filed a complaint with Liberty's Presidential Services Team, detailing all events up to that point. Other than a form email stating that the complaint was under review, Terrie and Veronica never received a response from the Presidential Services Team. To this day, they continue to wait for a response.

45. On April 12, 2021, at the end of their rope and left with no other options, Terrie and Veronica surrendered to Liberty's demands and allowed multiple investigators into their home despite the raging pandemic. On April 20, 2021, Michael Walcott ("Walcott"), a Field Claims Resolution Specialist, inspected Terrie and Veronica's home. A few days later, Paul Roe ("Roe"), an employee with American Leak Detection, also inspected the home. Roe concluded—as had Terrie and Veronica's plumber about five months earlier—that tree roots clogging the drain caused the backup and overflow.

46. On April 28, 2021, after more than five months of delaying, flip flopping and making Terrie and Veronica jump through multiple hoops, Liberty formally acknowledged that the damage to Plaintiffs' home was covered.

47. This should have been the end of the process. Unfortunately, Terrie and Veronica's ordeal was far from over. The next day, Liberty issued checks to Terrie and Veronica totaling less than $13,000 – not even remotely close to the hundreds of thousands of dollars in damage their home and personal property had sustained.

9

## LIBERTY PERSISTS IN MAKING TERRIE AND VERONICA JUMP THROUGH HOOPS

48.     In May 2021, Orchard began questioning the extent of Terrie and Veronica's building and personal property losses.  When Terrie and Veronica sent him the additional information he requested, he persisted in quizzing them about the floor claim, contending that only a portion of the floors needed to be replaced.  When Terrie and Veronica objected, Orchard indicated that a flooring expert would now need to inspect the premises, even though Orchard could have sent a flooring vendor at the same time he insisted on the other inspections.

49.     Soon thereafter, Liberty sent two additional investigators to Terrie and Veronica's home: David Coulam ("Coulam") of Yonan Carpet One Floor & Home, and a team of inspectors from Electronic Recovery Services (ERS).

50.     Next, Liberty demanded that Terrie and Veronica submit to a recorded examination under oath statement ("EUO").  Terrie and Veronica agreed and, on May 18, 2021, provided separate recorded statements to Liberty Mutual Special Investigator, Sandy Sutton ("Sutton"), truthfully answering every question they were asked.

51.     During the EUO, Sutton expressed skepticism about whether Terrie and Veronica could afford certain higher-priced personal items, remarking incredulously: "These are expensive items."

52.     One week later, on May 25, 2021, in a further attempt to wear them down, Liberty insisted that Terrie and Veronica submit to a second EUO.

53.     On June 1, 2021, Liberty continued the harassment, with yet another individual— this time Liberty's attorney, Steven Schuetz ("Schuetz")—contacting Terrie and Veronica to question them about their claim.

54.     While Terrie and Veronica dutifully answered Schuetz's questions, a few days later on June 9 they received a letter from him indicating that their claim would be closed if they did not submit to a second EUO.

55.     Two days later, on June 11, 2021, Orchard emailed a letter to Terrie and Veronica denying the majority of their claim yet again.  The coverage denial letter stated, in part: "Based on the facts that the insureds are refusing to comply with the conditions of the policy, refusing to attend the EUO, failure to exhibit the damage [sic] property, and not proceeding under the policy of insurance, further coverage is being denied."

56.     Liberty's professed basis for denial was again false.  Terrie and Veronica had complied with all conditions of the Policy, had both already provided an EUO, and had permitted multiple inspections of their property in the face of plainly discriminatory claims handling practices to which they were subjected due to their race and sexual orientation.  The motives behind Liberty's conduct had become patently clear on May 25, 2021.

### TERRIE AND VERONICA'S CONTRACTOR REVEALS THE TRUTH AND LIBERTY LAUNCHES A SHAM INQUIRY

57.     On May 25, 2021, Terrie and Veronica's general contractor, Chris Alexa, revealed what had been going on.  Alexa explained that, early on in his dealings with Liberty adjuster Colby Sherbafi, Sherbafi called Terrie a "nigger-carpet muncher," saying "whatever law school accepted that nigger-carpet muncher is fucking stupid."  Alexa further noted that Sherbafi had commented that Terrie was "too aggressive," a common racial stereotype leveled against Black women.  Finally, Sherbafi had told Alexa: "you know we don't cover these types of claims" and questioned why Alexa was working for these "carpet munchers," while referring to Veronica as a "dumb Puerto Rican bitch."  (Exhibit 1 – Declaration of Chris Alexa).

11

58.     Sherbafi's comments make plain the motivation behind his discriminatory handling of Terrie and Veronica's claim.  But this is not a case of one bad apple.  More subtle forms of discrimination continued well after Sherbafi left the company.

59.     For instance, Holmes, Sutton and Orchard all insinuated fraud on Terrie and Veronica's part, incredulous at the idea that minorities could own expensive items.  And, based on its discriminatory motives and claims handling practices, Liberty insisted that Terrie and Veronica submit to a second EUO in May 2021.

60.     On June 14, 2021, Terrie and Veronica sent Liberty a letter detailing the discriminatory conduct to which they were subjected and asking for their claim to be paid in full. (Exhibit 2 – Letter to Liberty).

61.     On June 29, 2021, Liberty responded, assuring Terrie and Veronica that it took their allegations of discrimination very seriously and that it would conduct a full investigation.

62.     Liberty did no such thing.  Only two days later, barely two weeks after Terrie and Veronica had sent their letter, Liberty's longtime outside counsel, James Morsch ("Morsch"), sent a response letter detailing the outcome of his alleged investigation that apparently revealed no indicia of discrimination.

63.     The investigation was a sham.  To begin with, instead of retaining an independent investigator, Liberty hired its own longtime outside counsel who had every incentive not to find any inappropriate conduct by his longstanding client with whom he enjoyed a lucrative relationship.  Second, instead of conducting a thorough inquiry, Morsch closed his examination in a matter of days, apparently hoping not to find anything that could expose his longtime client. Third, Morsch plainly focused his review on discrediting the complainants, rather than examining the extent of Liberty's discrimination and addressing the root causes.

64. If Morsch had conducted a thorough investigation, he would have quickly found, based on a simple internet search, that Sherbafi had authored a presentation titled *Xenophobia in Sweden*, the thesis of which is that Swedes have racist voting patterns, but they "are not racist, they are just fearful of foreign culture one day overtaking theirs."[8]

65. As a result of Liberty's conduct, to this day, Terrie and Veronica have been unable to fully repair their home and, in addition to suffering property damage, have experienced emotional distress stemming from Liberty's discriminatory claims handling practices.

66. But Terrie and Veronica's experience is not unique.

## LIBERTY'S DISCRIMINATORY PRACTICES

67. Like Terrie and Veronica, the members of the proposed classes have been subjected to discrimination during the claims handling process as a result of Liberty's failure to put in place effective policies to prevent and remedy discriminatory claims adjustment practices.

68. The pervasive discrimination and bias, and the failure of local and upper-level management to address it despite having actual and constructive notice of the discrimination, combined with Liberty's goal of limiting claims paid, creates a culture that encourages further discrimination.

69. Liberty's insufficient policies and procedures for addressing discrimination by claims handlers are promulgated by upper management and apply to all Liberty claims handlers nationwide. At every level, these measures are insufficient to prevent or remedy discrimination

---

[8] As of June 26, 2021, the presentation appears to have been removed from search results, however it can still be found here: https://prezi.com/jzbccwvhbet9/xenophobia-in-sweden/?fallback=1. Fear of influence from non-white cultures is a mobilizing belief for white nationalists. WHITE NATIONALISM, https://www.splcenter.org/fighting-hate/extremist-files/ideology/white-nationalist (last visited August 9, 2021). Sherbafi's thesis implies that fear of influence from non-white cultures is a legitimate concern and thus not racist.

during the claims handling process. Liberty's failure to counteract systemic bias signals to its claims handlers that discrimination is permitted.

70.     Upon information and belief, Liberty does not screen its claims handlers to weed out individuals who are biased against minorities, nor does it monitor their performance after they are hired to root out discrimination against minorities.

71.     Prevention of discrimination is not meaningfully prioritized by Liberty. Upon information and belief, Liberty does not consider whether its claims handlers are discriminating against minorities when it evaluates their performance. Instead, adjusters are evaluated based on traditional business metrics, including the number of claims that are denied or otherwise favorably adjusted (*i.e.*, reduced to the smallest amount possible). These metrics encourage claims handlers to follow their own conscious and subconscious biases, as well as outright animus toward minorities when they adjust and investigate claims.

72.     Upon information and belief, the immediate supervisors of claims handlers are not trained or in any way incentivized to address bias and discrimination during the claims handling process. Liberty does not train supervisors on recognizing bias and discrimination by claims handlers, how to investigate allegations of discrimination by policyholders, how to document the investigation, and how to remedy the situation.

73.     Supervisors and claims handlers have incentive to ignore or otherwise not report discrimination because doing so will likely result in Liberty paying out more claims. Upon information and belief, reporting discrimination would harm a supervisor's or claims handler's standing at Liberty.

74.     Upon information and belief, Liberty is aware that systemic bias and discrimination infects the claims-handling process, both because it has the claims data showing

14

disparities between the treatment of the claims of minority policyholders and white policyholders and because complaints of bias and discrimination (both internal and external) have come to management's attention.

75.     Upon information and belief, the majority of Liberty's claims handlers are white, and the lack of diversity amongst adjusters creates an environment ripe for conscious and subconscious bias against minorities.

76.     Despite being on notice of systemic bias and discrimination by claims handlers, Liberty has failed to take the institutional action necessary to adequately address, prevent, and remedy discrimination against minority policyholders.  Instead, Liberty has ignored the problem and continues to reap the benefits of bias and discrimination.

77.     Minority Liberty policyholders who have submitted claims have suffered greatly as a result of the discrimination that Liberty perpetuates, ratifies, and profits from.  Many, like Terrie and Veronica, are first-time homeowners dealing with significant property damage that disrupts their daily lives, requires them to leave their homes, and/or poses significant health risks.  Pervasive discrimination by claims handlers leaves countless rightful claims unpaid, leads to further property damage, and causes unnecessary emotional distress, as well as continuing damage to emotional and physical health.

78.     To remedy these systemic problems and civil rights violations by Liberty, Terrie Sullivan and Veronica Rodriguez ask this Court to (a) certify the proposed classes; (b) enter an order declaring that Liberty violated the civil rights of Plaintiffs and class members under the Fair Housing Act, 42 U.S.C. §§ 1981 and 1982, and the Illinois Human Rights Act; (c) enter an order declaring that Liberty breached its contracts with Terrie, Veronica and class members and violated 215 ILCS 5/155; (d) award punitive damages sufficient to deter Liberty from its

egregious violation of civil rights; (e) award attorneys' fees against Liberty, and (f) enter an

order requiring Liberty to take adequate steps to prevent and remedy discriminatory practices,

including:

      i.   Retaining an independent adjustment firm, recommended by class counsel and approved by the Court, to re-adjust all property insurance claims made by Liberty's minority policyholders in the last four years;

      ii.   Retaining an independent investigator, recommended by class counsel and approved by the Court, to conduct a comprehensive investigation into discriminatory claims handling practices at Liberty Mutual;

     iii.   Implementing effective anti-discrimination policies and procedures;

     iv.   Implementing mandatory anti-discrimination training and screening of claims handlers, claims handling supervisors and management;

      v.   Implementing all recommendations made by the independent investigator;

     vi.   Retaining an independent monitor, recommended by class counsel and approved by the Court, to monitor (a) Liberty's claims handling practices for discriminatory conduct for the next four years, and (b) Liberty's implementation of all court-ordered and investigator recommended anti-discrimination policies.

### CLASS ALLEGATIONS

79.    Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(c)(4), Plaintiffs

Terrie Sullivan and Veronica Rodriguez bring this action on behalf of classes of all other

similarly situated persons defined as follows:

Class – Minority Policyholders

All (1) Liberty policyholders (2) in the United States (3) who are Minorities (4) who made at least one claim for property coverage (5) at any time within the last four years prior to the filing of this complaint (6) whose claim was denied or only partially covered.

Subclass – Illinois Minority Policyholders

All (1) Liberty policyholders (2) in the state of Illinois (3) who are Minorities (4) who made at least one claim for property coverage (5) at any time within the last four years prior to the filing of this complaint (6) whose claim was denied or only partially covered.

80.    Excluded from the classes are any employees or agents of Liberty, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

81.    *Numerosity* – The precise number of class members is unknown at this time but can be identified through Liberty's own records that will be obtained through discovery as well as self-identification by class members.  Upon information and belief, the putative classes are expected to contain thousands of members.  Individual joinder of class members is impracticable.

82.    *Commonality* – There are questions of law and fact common to the claims of class members, including but not limited to the following:

    a.  Whether Liberty perpetuates a culture that incentivizes claims handlers to discriminate against minorities;

    b.  Whether Liberty has actual or constructive notice of discrimination by its claims handlers;

    c.  Whether Liberty has taken appropriate corrective actions to stop and prevent discrimination by its claims handlers;

    d.  Whether Liberty discriminates against minority policyholders during the claims handling process;

    e.  Whether Liberty discriminates against minority policyholders by holding minority policyholders to a higher standard during the claims adjustment process;

    f.  Whether Liberty discriminates against minority policyholders by improperly denying claims;

    g.  Whether Liberty discriminates against minority policyholders by improperly paying claims only partially;

    h.  Whether Liberty discriminates against minority policyholders by taking longer to pay claims made by minority policyholders.

83.    *Typicality* – The claims brought by Plaintiffs, Terrie Sullivan and Veronica Rodriguez, are typical of the claims of the proposed classes because class members were

17

exposed to the same discriminatory conduct by Liberty that led to the claims presently brought by Terrie and Veronica. The class members, Terrie, and Veronica were victims of the same violations by Liberty.

84.    *Adequacy of Representation* – Terrie, Veronica, and their counsel will fairly and adequately protect the interests of the classes. Terrie and Veronica have no disabling conflicts of interest that would be antagonistic to other members of the classes and they seek no relief that is antagonistic or adverse to the members of the classes. Terrie and Veronica's counsel are experienced class action and insurance litigators who will protect the interests of the classes.

85.    *Injunctive Relief* – Liberty's actions apply to all class members as all class members have been harmed by Liberty's past and continuing pattern of discriminatory conduct. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate with respect to the classes as a whole.

86.    *Particular Issues* – Alternatively, the existence of a pattern and practice of discrimination by Liberty is properly certified under Federal Rule of Civil Procedure 23(c)(4) for the class and subclass because such claims present common issues.

## COUNT I: VIOLATION OF THE FAIR HOUSING ACT
### (42 U.S.C. § 3604)

87.    Plaintiffs incorporate and restate by reference paragraphs 1 through 86 as though fully set forth herein.

88.    Liberty violated the Fair Housing Act when it subjected Plaintiffs and class members to pervasive discrimination during the claims handling process that caused Plaintiffs and class members to have rightful claims denied or paid only partially. In addition, due to Liberty's discriminatory practices, Plaintiffs and class members had to devote additional time and resources to prosecuting their claims. In addition to out-of-pocket expenses and time lost,

Plaintiffs and class members suffered emotional injuries that were the direct result of Liberty's discrimination.

89.     Despite actual or constructive knowledge that its claims handlers were discriminating against minorities by, among other practices, denying rightful claims, delaying payment of claims, and insisting on pretextual investigations and EUOs, Liberty failed to take immediate and appropriate corrective action to stop such conduct.  Instead, Liberty ignored the problem and continued to profit from the discrimination.

90.     The acts and omissions of Liberty constitute a pattern and practice of discrimination against Plaintiffs and the members of the proposed class and subclass.

91.     As a direct result of Liberty's discriminatory conduct, Plaintiffs and class members are entitled to damages including, but not limited to, punitive damages, attorneys' fees and costs, and pre-judgment interest.

## COUNT II: VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT
### (775 ILCS 5/10-102)

92.     Plaintiffs incorporate and restate by reference paragraphs 1 through 86 as though fully set forth herein.

93.     Liberty violated the Illinois Human Rights Act when it subjected Plaintiffs and subclass members to pervasive discrimination during the claims handling process that caused Plaintiffs and subclass members to have rightful claims denied or paid only partially.  In addition, due to Liberty's discriminatory practices, Plaintiffs and subclass members had to devote additional time and resources to prosecuting their claims.  In addition to out-of-pocket expenses and time lost, Plaintiffs and subclass members suffered emotional injuries that were the direct result of Liberty's discrimination.

94.     Despite actual or constructive knowledge that its claims handlers were discriminating against minorities by, among other practices, denying rightful claims, delaying payment of claims, and insisting on pretextual investigations and EUOs, Liberty failed to take immediate and appropriate corrective action to stop such conduct.  Instead, Liberty ignored the problem and continued to profit from the discrimination.

95.     The acts and omissions of Liberty constitute a pattern and practice of discrimination against Plaintiffs and the members of the proposed subclass.

96.     As a direct result of Liberty's discriminatory conduct, Plaintiffs and subclass members are entitled to damages including, but not limited to, punitive damages, attorneys' fees and costs, and pre-judgment interest.

## COUNT III: CIVIL RIGHTS VIOLATIONS
### 42 U.S.C. §§ 1981 AND 1982

97.     Plaintiffs incorporate and restate by reference paragraphs 1 through 86 as though fully set forth herein.

98.     But for the racially discriminatory conduct of Liberty, Plaintiffs' and class members' insurance claims would have been paid in full and in a timely manner.

99.     Liberty, by and through its conduct as set forth herein, has intentionally discriminated against Plaintiffs and class members by virtue of them being minorities.  Liberty thereby prevented Plaintiffs and class members from enjoying the benefits, privileges, terms, and conditions of their contractual relationship with Liberty in violation of 42 U.S.C. §§ 1981 and 1982.

100.     As a proximate result of Liberty's discriminatory conduct, Plaintiffs and class members have been damaged by Liberty's actions in that their rightful claims were denied, they spent significant time and energy prosecuting their claims, and they suffered emotional distress.

101.    Accordingly, Plaintiffs and class members are entitled to punitive damages plus attorneys' fees.

## COUNT IV: BREACH OF CONTRACT

102.    Plaintiffs incorporate and restate by reference paragraphs 1 through 86 as though fully set forth herein.

103.    A homeowners' insurance policy purchased from Liberty is an enforceable contract for insurance coverage.

104.    Plaintiffs and members of the putative classes paid premiums for Liberty homeowners' policies and satisfied their contractual obligations to Liberty.

105.    Liberty breached its contractual obligations to Plaintiffs and class members when it failed to provide the coverage benefits it promised.

106.    Specifically, Liberty denied rightful claims of minority policyholders based on race and sexual orientation.

107.    As a proximate result of Liberty's breach of contract, Plaintiffs and class members have been damaged by Liberty's conduct in that they have had rightful claims denied or paid only partially or have been forced to bear a greater portion of the costs associated with their claims than they are required to under the terms of their respective policies and have paid premiums for homeowners' insurance coverage that has been wrongfully denied them.

108.    Accordingly, Plaintiffs and class members have suffered damages resultant from Liberty's failure to adhere to its contractual obligations.

## COUNT V: BAD FAITH
### 215 ILCS 5/155

109.    Plaintiffs incorporate and restate by reference paragraphs 1 through 86 as though fully set forth herein.

110.    At all times relevant to this complaint, 215 ILCS 5/155 was in effect and prohibited Liberty from denying claims in a vexatious and unreasonable manner.

111.    By failing to provide agreed-upon coverage and denying claims on discriminatory bases, Liberty wrongfully denies policyholders' claims in a vexatious and unreasonable manner.

112.    Liberty's actions, which are conducted knowingly and frequently, constitute prohibited claims practices, and are intended to enrich Liberty by depriving minority policyholders of the coverage benefits to which they are entitled.

113.    Plaintiffs and subclass members have been damaged by Liberty's pattern and practice of denying coverage for discriminatory reasons in that they have had rightful claims denied or paid only partially or have been forced to bear a greater portion of the costs associated with their claims than they are required to under the terms of their respective policies and have paid premiums for homeowners' insurance coverage that has been wrongfully denied them.

114.    Accordingly, Plaintiffs and subclass members are entitled to attorneys' fees plus punitive damages pursuant to 215 ILCS 5/155.

### PRAYER FOR RELIEF

115.    Wherefore, Plaintiffs Terrie Sullivan and Veronica Rodriguez request that this Court enter judgement in their favor and against Defendant Liberty Mutual Insurance Company and for the following relief:

(a)    Certification of the class and subclass, as defined above;

(b)    Appointment of Terrie Sullivan and Veronica Rodriguez as class representatives;

(c)    Appointment of the undersigned as counsel for the class and subclass;

(d)    A declaration that Liberty is violating or has violated the civil rights of Plaintiffs and members of the class and subclass;

(e)    An injunction requiring Liberty to remedy the civil rights violations described

herein, and to prevent future discrimination, by:

    i.   Retaining an independent adjustment firm, recommended by class counsel and approved by the Court, to re-adjust all property insurance claims made by Liberty's minority policyholders in the last four years;

    ii.   Retaining an independent investigator, recommended by class counsel and approved by the Court, to conduct a comprehensive investigation into discriminatory claims handling practices at Liberty;

    iii.   Implementing effective anti-discrimination policies and procedures;

    iv.   Implementing mandatory anti-discrimination training and screening of claims handlers, claims handling supervisors and management;

    v.   Implementing all recommendations made by the independent investigator;

    vi.   Retaining an independent monitor, recommended by class counsel and approved by the Court, to monitor (a) Liberty's claims handling practices for discriminatory conduct for the next four years, and (b) Liberty's implementation of all court-ordered and investigator recommended anti-discrimination policies.

(f)    An order retaining jurisdiction over this action to ensure that Liberty complies with such a decree.

(g)    An award of punitive damages that the Court or jury determines to be fair and sufficient to punish, penalize, and/or deter Liberty;

(h)    An award of reasonable attorneys' fees and costs;

(i)    Fees, costs and other amounts recoverable pursuant to 215 ILCS 5/155;

(j)    Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

(k)    Any further relief as this Court deems just.

### JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

November 15, 2021

Respectfully submitted,

*/s/ Daniel I. Schlessinger*
Daniel I. Schlessinger
Martin W. Jaszczuk
Margaret M. Schuchardt
Seth H. Corthell
Tamra J. Miller
JASZCZUK P.C.
30 South Wacker Drive, Suite 2200
Chicago, Illinois  60606
Tel: (312) 442-0509
dschlessinger@jaszczuk.com
mjaszczuk@jaszczuk.com
mschuchardt@jaszczuk.com
scorthell@jaszczuk.com
tmiller@jaszczuk.com